**FILED**

JUN 2 4 2002

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----ooOoo----

MONETTE GOSCINIAK,

        Plaintiff,

    v.

COUNTY OF SACRAMENTO et al.,

        Defendants.

NO. CIV. S-01-0174 WBS/GGH

MEMORANDUM AND ORDER

----ooOoo----

        Plaintiff Monette Gosciniak brings this action against defendants County of Sacramento, Sacramento County Sheriff's Deputy Robert Craft, and Kings Arco Arena Limited Partnership L.P. ("Arco") for various federal and state law claims. Defendants move for summary judgment under Federal Rule of Civil Procedure 56.

I.  Factual Background

    A.  Gosciniak's Account of Events

        On January 27, 2000, Gosciniak attended a Reba McEntire country music concert held at Arco Arena. Her two daughters, her sister, and her sister-in-law accompanied her. Gosciniak did not drink any alcohol before or during the concert. (Gosciniak Dep.

1

41

1  at 52-56; I. Balderama Dep. at 13-14; Marriot Dep. at 9-12; S.

2  Balderama Dep. at 22-34).  Gosciniak and some of her family

3  members claim that they were enjoying the show and did not bother

4  or have any interactions with people around them.[1]  (Gosciniak

5  Dep. at 59-60; I. Balderama Dep. at 14-15).

6        Toward the beginning or middle of the show, Gosciniak

7  left to use the restroom, and when she returned she was

8  approached by Arco security agent Doug Dowell.  (Gosciniak Dep.

9  at 60-61).  Gosciniak could not understand what Dowell was saying

10 to her because of the loud music, and thought that he was

11 requesting her tickets.  (Id. at 66).  According to Gosciniak,

12 Dowell took her arm and escorted her from her seat, telling her

13 "You have to come with me."  (Id. at 66; 130-132).   Gosciniak

14 and her family members followed Dowell, and were taken to the

15 edge of a tunnel where they encountered another Arco security

16 agent Judy Diane Shepherd.  (Id. at 68-69).  Gosciniak asked

17 Dowell and Shepherd why they were removed from the show and where

18 they were going, but was told to continue following Dowell.  (Id.

19 at 70-71).

20        The group entered the Arco Arena security headquarters

21 office.  Among the individuals present in the office were

22 defendant Sacramento County Sheriff's Department ("SCSD") Captain

23 Robert Craft, SCSD Sergeant James Burich, Arco's Security

24 Director Jack Peirson, and Arco "Sergeant" Thurman Watson.

25 Gosciniak and her family members asked the individuals in the

26 ―――――――――――

27      [1]   The court notes that Vanessa Marriot, one of
   plaintiff's daughters, testified that at least one patron sitting
28 behind the women commented that they "need to stop moving" during
   the concert.  (V. Marriot Dep. at 16-19).

room what was going on and why they were there.  (<u>Id.</u> at 77-78).
One of the men, probably Watson, allegedly said "This is no rock
concert, this isn't no hip-hop session."  (<u>Id.</u> at 77).  Gosciniak
said "I purchased these tickets.  I paid $500 for these tickets
to come to a concert . . . I didn't win them . . . I know what
kind of concert I'm in . . . I bought them to come watch it."
(<u>Id.</u>).  Apparently she and her family members were given no
explanation as to why they were brought to the room.  One person
told her that she would need to speak with another man who was on
the phone.  (<u>Id.</u> at 80).  By that time, they were in the room for
approximately 15-20 minutes.  (Ybarra Dep. at 16).

       At that point, Gosciniak announced: "Well, if there is
no reason for me to be here, you don't know why I'm here, if I
haven't done anything wrong, then I'm going to go back into the
concert, and you can come and get me, you know, when this guy is
ready."  (Gosciniak Dep. at 80-81).  She testified that "I turned
around at that point, and that's when my arm was grabbed by the
man . . . with the ranger hat on."  (<u>Id.</u> at 81).  It is
undisputed that defendant Craft was the person who touched
Gosciniak's arm.  Her daughter, Lorraine Ybarra, testified that
she saw Gosciniak walk toward the door before Craft pulled her
arm back.  (Ybarra Dep. at 16).  Gosciniak testified that Craft
"grabbed one portion of my lower arm, one portion of my upper
arm, and he brought it behind my back."  (Gosciniak Dep. at 91).
Although Craft's placement of her arm behind her back initially
did not cause her to feel pain, he "started jerking it up because
I was asking him what he was doing."  (<u>Id.</u> at 92).  Gosciniak
claims that "it felt like he was lifting it up to where everytime

3

1  he kept twitching it, I kept having to jump up" and that she was
2  saying "[l]et me go.  What did I do wrong?  Am I under arrest?
3  What's your name?  You're hurting me.  Stop.  Let go of my arm."
4  (Id. at 92-93).  Marriot testified that her mother appeared to be
5  raised to her toes while her arm was being twisted.  (Marriot
6  Dep. at 50-51).  Gosciniak states that she felt "burning" pain
7  and a "ripping burn" while Craft was jerking up her arm, and when
8  he let go she did not feel "ripping" but her arm still felt like
9  it was "burning." (Gosciniak Dep. at 108).  She contends that
10 Craft held her arm behind her back for about two minutes.  (Id.
11 at 94).

12      After Craft released her, Gosciniak complained to
13 everyone in the room that her arm was red, that it was hurting,
14 and that she wanted someone to take a picture of it.  (Id. at
15 94).  The individuals in the room informed her that they did not
16 have a camera.  (Id. at 95).  Gosciniak subsequently spoke with
17 Peirson, who did not tell her that she had done anything wrong
18 and did not respond to her complaints about her encounter with
19 Craft.  (Id. at 96-99).

20      Gosciniak and her family members were released from the
21 Arco security office and subsequently drove to a hospital.  (Id.
22 at 107-108).  The diagnosis noted in the hospital report was an
23 acute sprain of the right shoulder.  (Haddad Decl., Ex. H).  An
24 MRI taken five days later indicated "probable partial tears" of
25 the rotator cuff in her right shoulder.  (Id. Ex. U).  David
26 Anslinger, the physician's assistant who treated her, testified
27 that the maneuver she described, namely having her arm wrenched
28 behind her back, was probably the cause of her shoulder injury.

4

1  (Anslinger Dep. at 24-26).  Gosciniak testified in her deposition
2  that she had sustained a prior injury to her right shoulder in
3  1999.  (Gosciniak Dep. at 26-28).  Anslinger was not aware of her
4  prior injury when he treated her in February 2000.  (Anslinger
5  Dep. at 10).  Gosciniak claims that after the incident, she was
6  unable to work for seven weeks and that she continues to have
7  pain and weakness in her right shoulder.  (Haddad Decl., Ex. X).

8       B.   Defendants' Account of Events

9        Defendants' description of the events in question
10  differs considerably from Gosciniak's version.  During the
11  concert, Craft was contacted by radio for assistance in the
12  security office.  (Craft Dep. at 80).  When he arrived, the room
13  was extremely noisy, and a few of the women he encountered were
14  shouting.  (Id. at 83).  Gosciniak was by far the most vocal.
15  (Id.).  She appeared extremely angry, and was repeatedly yelling
16  profanities such as "I want my fucking money back" and "I am
17  going to fucking sue every person in this room."  (Burich Dep. at
18  32; Craft Dep. at 85-86).  Craft contends that Gosciniak was
19  "walking around the room very animated, flailing her arms, and
20  screaming" profanities.  (Craft Dep. at 85).

21        Various ARCO employees had smelled alcohol emitting
22  from Gosciniak when she and her family members were removed from
23  their seats and taken to the security office.  (Dowell Dep. at
24  33; Shepherd Dep. at 31).  While he was in the office, Craft
25  stood between Gosciniak and the exit door.  (Craft Dep. at 96).
26  She then attempted to leave the room, and hit Craft in the chest
27  with her hand to push him aside and go out the door.  (Craft Dep.
28  at 95-96).

1    Craft then took her right arm and placed her in a
2  control hold.  (Id. at 95).  Defendants describe the control hold
3  as a maneuver by which an officer places a person's left or right
4  hand behind their back while grasping their fingers, and applies
5  pressure to control the person's movements.  (Craft Dep. at 50).
6  If the person does not resist, then there is no pressure.  The
7  officer applies pressure to control a person who is moving.[2]
8  (Id.).  While placing her in a control hold, Craft told Gosciniak
9  that she needed to calm down and that her behavior was
10  unacceptable.  (Id. at 97).  Craft explains that he maintained
11  firm pressure on her wrist and fingers and that she was in a
12  controlled position.  (Id. at 99).  Craft does not recall if she
13  was lifted to her toes, but states that if a person resists
14  during a control hold they can end up on their toes.  (Id.).
15  Craft contends that Gosciniak continued to scream, saying that
16  she wanted "her fucking money back", and that she smelled like
17  alcohol.  (Id. at 97, 110).  He says that he held her for about
18  fifteen to twenty seconds before releasing her.  (Id. at 97).

19    Craft contends that Gosciniak's profanity had no
20  bearing on his decision to place her in a control hold or to
21  apply any pressure during the hold.  (Id. at 102).  He states
22  that  Gosciniak was at no time under arrest, and was not told
23  that she was under arrest.  (Id. at 98).  Although he contends

24  _____
25    [2]   Craft describes the control hold in which he placed
   Gosciniak as a "twist lock."  (Craft Dep. at 97).  SCSD Sergeant
26  David Coffman testified in a deposition regarding the use of
   compliance holds such as twist locks, hammer locks, and a rear
27  wrist lock control hold.  Coffman explained that the terminology
   used to refer to various types of control holds is similar and is
28  frequently interchanged by police officers.  (Coffman Dep. at
   81).

6

1 that she may have violated the penal code section prohibiting
2 assault of a peace officer, Cal. Penal Code § 243, he nonetheless
3 decided not to arrest her.   (Id. at 99).  Craft did not fill out
4 a report concerning this incident, and apparently did not discuss
5 the incident with any other witnesses.[3]

6 II.   Discussion

7         The court must grant summary judgment to a moving party
8 "if the pleadings, depositions, answers to interrogatories, and
9 admissions on file, together with the affidavits, if any, show
10 that there is no genuine issue as to any material fact and that
11 the moving party is entitled to judgment as a matter of law."
12 Fed. R. Civ. P. 56(c).  The party adverse to a motion for summary
13 judgment may not simply deny generally the pleadings of the
14 movant; the adverse party must designate "specific facts showing
15 that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e);
16 Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Simply put, "a
17 summary judgment motion cannot be defeated by relying solely on
18 conclusory allegations unsupported by factual data."  Taylor v.
19 List, 880 F.2d 1040, 1045 (9th Cir. 1989).  The non-moving party
20 must show more than a mere "metaphysical doubt" as to the
21 material facts.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475
22 U.S. 574, 587 (1986).

23 ///
24 ///

25

26     [3]   Arco security officer Shepherd filled out an incident
report documenting her encounter with Gosciniak before she and
27 her family members were taken to the security office.  The report
notes that when Shepherd encountered the women in the tunnel,
28 they were angry, shouting, using profanity, and that she could
smell a strong odor of alcohol.  (Flesher Decl., Ex. B).

A.  Section 1983 Claim Against Craft

1.  Qualified Immunity Standard

Gosciniak alleges that Craft's control hold maneuver constituted excessive force in violation of her Fourth Amendment rights.[4]  Section 1983 creates a private right of action against persons acting under color of law who violate federal constitutional or statutory rights.[5]  42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1998).  Qualified immunity, however, shields a defendant from liability if his conduct did not violate the plaintiff's clearly established constitutional rights, or if he could have reasonably believed that his conduct was lawful. Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001).  A defendant bears the burden of establishing qualified immunity.[6]  Crawford-El v. Britton, 523 U.S. 574, 641 (1998).

In Saucier v. Katz, the United States Supreme Court

---

[4]    Gosciniak was not searched or arrested in the course of the incident.  Accordingly, the court construes Gosciniak's section 1983 claim against Craft as premised solely on her allegations of excessive force.  Furthermore, to the extent her allegations seek to establish a Fourteenth Amendment violation, any such claim is DISMISSED.  In Graham v. Connor, the Supreme Court held that "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."  490 U.S. 386, 395 (1989).

[5]    The parties do not dispute that Craft was acting under color of law.

[6]    The court rejects Gosciniak's contention that Craft waived the defense of qualified immunity by failing to raise it in his answer.  A party may raise an affirmative defense for the first time on summary judgment in the absence of a showing of prejudice.  Camarillo v. McCarthy, 998 F.2d 638, 639 (9th Cir. 1993).

articulated the following two-part test for determining whether a
defendant is entitled to qualified immunity.  533 U.S. 194
(2001).  As a threshold question the court must ask: "Taken in
the light most favorable to the party asserting the injury, do
the facts alleged show the officer's conduct violated a
constitutional right?"  Id. at 201.  If the answer is
affirmative, "the next, sequential step is to ask whether the
right was clearly established."  Id.  The court emphasized that
the "relevant, dispositive inquiry in determining whether a right
is clearly established is whether it would be clear to a
reasonable officer that his conduct was unlawful in the situation
he confronted."  Id. at 202.   If the answer to this question is
negative, then the defendant is entitled to qualified immunity.
Id.

The Supreme Court has repeatedly stressed "the
importance of resolving immunity questions at the earliest
possible stage in the litigation."  Hunter v. Bryant, 502 U.S.
224, 227 (1991).  Where a defendant seeks qualified immunity, "a
ruling on that issue should be made early in the proceeding so
that the costs and expenses of trial are avoided where the
defense is dispositive."  Saucier, 533 U.S. at 200.

2.   Fourth Amendment Limits on the Use of Force

Under the Fourth Amendment, a police officer may use
only such force as is "objectively reasonable under the
circumstances."  LaLonde v. County of Riverside,  204 F.3d 947,
959 (9th Cir. 2000) (citing Graham, 490 U.S. at 397).  Whether
force is excessive is measured by factors such as the severity of
the crime at issue, whether the suspect poses an immediate threat

9

1 to the safety of the officers or others, whether he is actively
2 resisting arrest or attempting to evade arrest by flight, and the
3 extent of the injury inflicted.  Graham, 490 U.S. at 396; White
4 v. Pierce County, 797 F.2d 812, 816 (9th Cir. 1986).  The
5 "reasonableness" of a particular use of force is to be judged
6 "from the perspective of a reasonable officer on the scene,
7 rather than with the 20/20 vision of hindsight."  Graham, 490
8 U.S. at 396.  A court evaluating an excessive force claim must
9 recognize that police are often forced to make "split-second
10 judgments--in circumstances that are tense, uncertain, and
11 rapidly evolving--about the amount of force necessary in a
12 particular situation."  Id. at 397.

13                    a.  Constitutional Violation

14           Considering the facts in a light most favorable to
15 Gosciniak, a jury could decide that Craft's actions constituted
16 excessive force.  It is undisputed that when Gosciniak arrived at
17 the Arco security office, she had not committed a crime and was
18 not under arrest.  She contends that before Craft placed her in a
19 control hold, she was merely turning toward the door in an
20 attempt to leave the room.  Therefore, Gosciniak was not
21 resisting arrest or attempting to evade arrest, which are among
22 the factors set forth in Graham for determining reasonableness.
23 490 U.S. at 396.  Under Gosciniak's version of the facts, it
24 does not appear that she posed an immediate threat to the safety
25 of Craft or other individuals in the room.  Even under Craft's
26 version, there is no evidence that she was under arrest at any
27 time.  There is no evidence that she or any of her family members
28 were carrying a weapon.  Her version of the facts suggests that

                              10

1  she was merely inquiring why they were taken out of their seats
2  by Arco security personnel and made to wait in the room during
3  the concert.

4  Furthermore, Gosciniak sustained a significant injury
5  to her shoulder.  She testified that while she was in the control
6  hold, she experienced a "burning" and "ripping" pain.  She also
7  testified that Craft applied pressure to her arm despite her
8  pleas that he was hurting her.  Medical tests subsequent to the
9  incident revealed that she sustained a sprain to her shoulder and
10 partial tears of her rotator cuff.  See LaLonde, 204 F.3d at 959
11 (viewing extent of injury as probative of amount of force used).

12 The Ninth Circuit has emphasized that in assessing
13 reasonableness, a court must balance the amount of force applied
14 with the need for that force.  Alexander v. City and County of
15 San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994) ("[I]t is the
16 need for force which is at the heart of the consideration of the
17 Graham factors.").  Here, a reasonable jury could conclude that
18 there was little or no need for Craft to use a painful control
19 hold maneuver against Gosciniak, and that the forced used was
20 excessive in light of her serious injury.

21                    b.  Qualified Immunity Defense

22 In proceeding to the second question under Saucier, the
23 court must decide whether Craft could reasonably have believed
24 that his conduct was lawful in the situation he confronted.[7]  533

25

26        [7]    In evaluating allegations of excessive force in the
   Fourth Amendment context, the Court held that "the ruling on
27 qualified immunity requires an analysis not susceptible of fusion
   with the question whether unreasonable force was used in making
28 the arrest."  Saucier, 533 U.S. at 197.  In other words, a court

                              11

1  U.S. at 208 ("The question is what the officer reasonably
2  understood his powers and responsibilities to be, when he acted,
3  under clearly established standards.").   The Supreme Court
4  emphasized in <u>Saucier</u> that the "concern of the immunity inquiry
5  is to acknowledge that reasonable mistakes can be made as to the
6  legal constraints on particular police conduct."[8]   <u>Id.</u> at 205.
7  Given that <u>Graham</u> "does not always give a clear answer as to
8  whether a particular application of force will be deemed
9  excessive by the courts," the doctrine of qualified immunity
10 operates to "protect officers from the sometimes 'hazy border
11 between excessive and acceptable force.'"   <u>Id.</u> at 205-206.
12         In <u>Saucier</u>, the factual dispute rested on a plaintiff's

should not deny summary judgment any time a material issue of
fact remains on the constitutional claim.  <u>Id.</u> at 202.

   [8]   Craft argues that Gosciniak fails to show that there is
precedent that governs the use of control holds under the Fourth
Amendment, such that it would have put Craft on hold that his use
of force was unlawful.  (County of Sacramento Reply at 5).  It is
not necessary that there be a prior case prohibiting precisely
this type of force in precisely these circumstances.  <u>Deorle v.
Rutherford</u>, 272 F.3d 1272, 1285 (9th Cir. 2001).  "Otherwise,
officers would escape responsibility for the most egregious forms
of conduct simply because there was no case on all fours
prohibiting that particular manifestation of unconstitutional
conduct."  <u>Id.</u> at 1286.  A recent Ninth Circuit case on which
Craft relies, <u>Robinson v. Solano County</u>, 278 F.3d 1007 (2002), is
distinguishable.  There, the court granted qualified immunity to
police officers on an excessive force claim arising from an
incident in which they pointed a gun at the head of an unarmed
suspect.  <u>Id.</u> at 1014-16.  The Ninth Circuit noted that when the
conduct occurred in 1995, the law in various circuits was
entirely unsettled about whether pointing a gun in these
circumstances constituted a Fourth Amendment violation.  <u>Id.</u> at
1015.  In the instant case, even if there was no prior decision
involving the use of a particular control hold maneuver, it would
have been clear to a reasonable officer that wrenching the arm of
a suspect who was not resisting to the point where the person was
exclaiming in pain was excessive under the circumstances.  <u>Santos
v. Gates</u>, 287 F.3d 846, 854 (9th Cir. 2002)("Force is excessive
when it is greater than is reasonable under the circumstances.").

claim that a police officer violated his Fourth Amendment rights by using excessive force to arrest him. Id. at 199. The plaintiff, who was planning to protest the Vice President's speech at a public event, was forcibly removed from the audience by police officers and shoved into a police van. Id. The Court found that in light of the circumstances as the officers perceived them, the plaintiff may have posed a safety threat and the officers' response was "within the bounds of appropriate police responses." Id. at 208. The Court's conclusion was confirmed "by the uncontested fact that the force was not so excessive that [the plaintiff] suffered hurt or injury." Id.

Unlike the factual circumstances in Saucier, the factual dispute underlying this case does not fall within the "hazy border between excessive and acceptable force." Id. at 206. Here, Gosciniak's version of events suggests that she did not pose a safety or security threat to Craft or any other person in the room. She denies that she did anything other than turn around to go out the door, and says that she never hit, pushed, or struck Craft. (Gosciniak Decl. ¶¶ 3-6). Unlike the plaintiff in Saucier, Gosciniak sustained a serious injury at the time of the incident, and she continues to have pain and weakness in her shoulder.

The evidence suggests that Craft twisted her arm to the point that she was lifted to her toes and that she was exclaiming in pain. Whether she offered any resistance while Craft kept her in the control hold and may have contributed to her injury is in dispute. Furthermore, under Gosciniak's version of the facts, even if Craft may have been mistaken as to whether Gosciniak

13

presented a security risk when she attempted to leave the room, the force applied to bring her into compliance once he seized her arm and stopped her from leaving was greater than necessary under the circumstances.

In determining whether a defendant is entitled to qualified immunity, the court must view the facts in the light most favorable to the plaintiff and draw all inferences in her favor. <u>Headwaters Forest Defense v. County of Humboldt</u>, 276 F.3d 1125, 1130 (9th Cir. 2002). The court cannot weigh evidence or make credibility determinations. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). The facts considered from Gosciniak's perspective suggest that a reasonable officer would not have believed that he was acting lawfully under the circumstances. Rather, it would have been clear to a reasonable officer that the force Craft used in applying the control hold to Gosciniak was excessive.

Accordingly, Craft is not entitled to summary judgment on the basis of qualified immunity on Gosciniak's excessive force claim.

B.   <u>Section 1983 Claim Against Sacramento County</u>

Gosciniak argues that Sacramento County is liable for her injuries because the SCSD had a policy of not requiring its officers over the rank of sergeant to receive regular training on defensive tactics, including the proper use of control holds. A municipality may be liable under section 1983 where its failure to train employees amounts to "deliberate indifference" to the

14

rights of persons with whom the police come into contact.[9] <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989); <u>Alexander</u>, 29 F.3d at 1367.   Such a rule is consistent with the Supreme Court's admonition in <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 694 (1978), that a municipality can only be liable under section 1983 where its policies are the "moving force behind the constitutional violation." <u>City of Canton</u>, 489 U.S. at 389 (internal citations and quotations omitted).

Here, the fact that defensive tactics training for officers over the rank of sergeant was optional is simply insufficient to establish that the SCSD's training program was so inadequate so as to amount to deliberate indifference on the part of the County.   SCSD Sergeant David Coffman testified that training on the topic of control holds was required for department employees with the rank of sergeant and below. (Coffman Dep. at 88).   He further testified that officers trained on control holds were taught to perform the maneuvers properly.   (<u>Id.</u> at 77-81).   The policy of making such training optional for high-ranking officers may reflect a decision by the SCSD that officers at these levels have sufficient experience

---

[9]   Under Ninth Circuit authority, a sheriff's department is a county, rather than a state actor, when overseeing law enforcement activities such as crime investigation and jail administration, and thus may be subject to liability under section 1983.   <u>Brewster v. Shasta County</u>, 275 F.3d 803, 807 (9th Cir. 2001); <u>Streit v. County of Los Angeles</u>, 236 F.3d 552, 564 (9th Cir. 2001).   The policy at issue in this case is the SCSD's training program, which is an integral part of the department's law enforcement functions.   California Penal Code § 70, on which the County relies in support of the argument that the County is a state actor because of its policy requiring off-duty police officers to enforce state laws, is not applicable here. Accordingly, the county is not entitled to Eleventh Amendment immunity.

with control hold techniques based on prior training and the fact that such techniques are used regularly in the course of their police duties.

Gosciniak is primarily focused on evidence that Craft received no training on control holds since at least 1990 and that he had never been trained that applying a "twist lock" improperly could injure someone.[10]  She also alleges that he violated the standard of care for performing control holds as they are taught by the SCSD.  Under City of Canton, liability cannot attach to the County on the basis of these allegations. 489 U.S. at 390-91.  The fact that a particular officer may be unsatisfactorily trained is insufficient, by itself, to fasten liability on the County, given that an "officer's shortcomings may have resulted from factors other than a faulty training program."  Id.  "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct."  Id. at 391.  Finally, the Court has noted that "adequately trained officers occasionally make mistakes" and that the fact that such mistakes occur "says little about the training program or the legal basis for holding a [municipality] liable."  Id.

Absent evidence that the alleged inadequacies of

---

[10]    Craft testified that he was trained in the use of control holds three or four years prior to his deposition. (Craft Dep. at 51).  A search of his record revealed no documents indicating that he had received this training.  Defendants point out, however, that pursuant to a stipulation between the parties, Craft was required to search his own records and not the records of the SCSD.

16

1  Craft's training was the result of a "deliberate" or "conscious"

2  choice by County officials that was the moving force behind the

3  constitutional violation, the County cannot be subjected to

4  section 1983 liability.[11]  <u>Alexander</u>, 29 F.3d at 1367.

5  Accordingly, Sacramento County is entitled to summary judgment.

6      C.  <u>Section 1983 Claim Against Arco Arena</u>

7          Gosciniak seeks to impose liability on Arco Arena on

8  the basis that it acted "in concert" with Sacramento County and

9  defendant Craft in perpetuating the alleged constitutional

10 violation.  For the purpose of section 1983 liability, a private

11 entity may be deemed to be acting under color of law when it is a

12 "willful participant in joint action with the State or its

13 agents."  <u>Dennis v. Sparks</u>, 449 U.S. 24, 27 (1980).

14          1.  <u>Relationship Between Sacramento County and Arco</u>

15 <u>Arena</u>

16         Arco Arena employs private civilian security guards to

17 assist guests, maintain order, and prevent and break up fights.

18 (Dowell Dep. at 17; Kearns Decl., Ex. B).  The security guards

19 are not armed with handguns or other weapons, and only carry

20 handcuffs if they are certified to do so.  (Dowell Dep. at 101.

21 Peirson Dep. at 66).  These guards are supervised and trained by

22 Jack Peirson, who is the Director of Security and Parking for

23 Arco.

24

25     [11]  The Supreme Court has cautioned that adopting lesser
26 standards of fault and causation in this context "would open
   municipalities to unprecedented liability" under section 1983,
27 would result in "de facto respondeat superior liability" and
   would "engage the federal courts in an endless exercise of
28 second-guessing municipal employee-training programs."  <u>City of</u>
   <u>Canton</u>, 489 U.S. at 391-92.

Arco also retains the services of off-duty sworn peace officers through the County of Sacramento.  The SCSD's Off-Duty Employer Agreement provides that "[d]eputies can perform law enforcement functions only."  (Kearns Decl., Ex. C).  According to Craft, who was retained by Arco pursuant to this agreement, the County of Sacramento pays the deputies for their off-duty hours directly, and the County is then reimbursed by Arco for providing these services.  (Craft Dep. at 19).

The deputies who provide law enforcement services at Arco are usually supervised by two higher-ranking deputies, one inside the arena and one outside the arena.  (<u>Id.</u> at 71).  Craft testified that Arco personnel and the SCSD deputies have a "good cooperative relationship."  (<u>Id.</u> at 72).  Peirson coordinates with the deputy supervisors before an event by, among other things, recommending staffing levels.  (<u>Id.</u>).  Deputies are sometimes required to submit an incident report depending on the nature of the incident they encounter, although Peirson testified that deputies generally use their discretion in deciding whether a report is necessary.  (Peirson Dep. at 32).

Arco denies that its officials instruct or supervise the deputies as to how to perform their law enforcement duties. However, Gosciniak points to Peirson's testimony that "a sheriff for each event that is the supervisor for that shift . . . would come under my direction."  (Peirson Dep. at 26).  Craft testified that the deputies "worked in concert with the civilian Arco Arena staff."  (Craft Dep. at 70).

2.  <u>Arco's Liability</u>

Even if the court were to assume that Arco was acting

18

1  under color of law, Gosciniak has not presented sufficient

2  evidence to impose liability on Arco under section 1983.   "A

3  corporation acting under color of state law will only be held

4  liable under § 1983 for its own unconstitutional policies."

5  Sanders v. Sears, Roebuck & Co., 984 F.2d 972, 975-76 (8th Cir.

6  1993), cited in Otani v. City and County of Haw., 126 F. Supp. 2d

7  1299, 1306-07 (D. Haw. 1998).  The standard for evaluating Arco's

8  liability is the same applied to determine municipal liability,

9  which is whether there is a policy, custom or action by

10  policymakers that motivated a constitutional violation.   Monell,

11  436 U.S. at 690-91.  Arco cannot be held liable for the

12  unconstitutional acts of its employees under section 1983 on a

13  respondeat superior theory.   Monell, 436 U.S. at 691.

14         Here, Gosciniak has not presented any evidence of a

15  policy by Arco to promote the use of excessive force against

16  patrons.  As discussed above, there is no evidence that Arco

17  personnel give sheriff's deputies instructions how to carry out

18  an arrest or other "seizure" of Arco patrons or on how to conduct

19  other law enforcement functions.  Because Gosciniak does not

20  raise a triable issue that the alleged violation was committed

21  pursuant to an unconstitutional Arco policy, she cannot establish

22  a claim against Arco under section 1983.

23         D.   State Claims

24              1.   Defendant Craft

25                   a.   State Law Immunities

26         Government Code section 820.2 provides immunity to a

27  public employee from liability based on "an injury resulting from

28  his act or omission where the act or omission was the result of

19

1  the exercise of the discretion vested in him, whether or not such
2  discretion is abused."  Cal. Gov't Code § 820.2.  However, this
3  statute does not confer immunity on officers for discretionary
4  acts involving the unreasonable use of force.  <u>Price v. County of</u>
5  <u>San Diego</u>, 990 F. Supp. 1230 (S.D. Cal. 1998) (holding that
6  section 820.2 provided immunity to officers who did not use
7  excessive force in restraining plaintiff during arrest).

8        For the same reasons that the court has determined that
9  Gosciniak has raised a triable issue as to whether Craft's use of
10 a control hold constituted excessive force under the Fourth
11 Amendment, a triable issue of fact likewise exists as to whether
12 Craft is entitled to immunity under state law.

13               b.  <u>California Constitution</u>

14        Gosciniak alleges that Craft violated her rights under
15 Article I of the California Constitution.  Article I, section 13
16 of the California Constitution is substantially identical to the
17 Fourth Amendment to the United States Constitution.  However,
18 Gosciniak has provided no authority, and the court has found
19 none, specifically authorizing a suit for damages under Article
20 I, section 13 of the California Constitution.[12]  In a recent case
21 brought in this district, the court denied a Rule 15(b) motion
22 where the plaintiff sought to amend her pleadings to resurrect an
23 Article I, section 13 claim that was abandoned at the pretrial
24 conference.  <u>See</u> <u>Lifton v. City of Vacaville</u>, CIV-S-98-1678, DFL

25

26  [12]    In <u>Sacramento County Deputy Sheriff's Ass'n. v. County</u>
<u>of Sacramento</u>, 51 Cal. App. 4th 1468, 1485 (1996), the plaintiff
27  brought a claim under Article I, section 13 in addition to a
federal Fourth Amendment claim.  However, the federal claim was
28  dismissed and the court did not address issues related to the
viability of the state constitutional claim.

DAD (E.D. Cal. Feb. 15, 2002).  In <u>Lifton</u>, Judge Levi reasoned that the absence of authority supporting a claim for damages under this constitutional provision suggests that such a claim is not viable under California law.  <u>Id.</u> at 22.

Gosciniak's state constitutional claim is also premised on Article I, section 1, which the California Supreme Court has interpreted as creating a cause of action for privacy violations. <u>White v. Davis</u>, 13 Cal. 3d 757, 775 (1975).  However, Gosciniak has provided no authority, and the court has found none, suggesting that an excessive force claim can also constitute a privacy violation.  Accordingly, Craft is entitled to summary judgment on Gosciniak's claims under the California Constitution.[13]

### c.  California Civil Code section 52.1

California Civil Code Section 52.1 provides for a private right of action if a person interferes or attempts to interfere with "the exercise or enjoyment by any individual . . . of rights secured by the Constitution or laws of the United States, or . . . of this state" by threats, intimidation, or coercion.  For the reasons discussed above, Gosciniak has raised material issues of fact as to whether her federal Fourth Amendment right was violated by Craft's use of excessive force. For those same reasons, Craft is not entitled to summary judgment on this claim.

---

[13]    The court is guided by the reasoning in <u>Graham</u>, 490 U.S. at 395, in which the U.S. Supreme Court held that because the Fourth Amendment provides an explicit textual source of protection against excessive force claims, such claims are properly brought under the Fourth Amendment rather than the Fourteenth Amendment's due process clause.

d.   California Civil Code section 51.7

Gosciniak wishes to dismiss her constitutional claims for race and gender discrimination as well as her claim under section 51.7.  Accordingly, the court grants summary judgment to defendant Craft on these claims.

e.   Battery and Negligence

A plaintiff may bring a battery claim against a police officer who uses excessive force in effectuating an arrest or detention.  Edson v. City of Anaheim, 63 Cal. App. 4th 1269, 1274 (1998) (holding that "a prima facie battery is not established unless and until plaintiff proves that unreasonable force was used.").  Because Gosciniak's battery claim arises from the same allegedly excessive force as her Fourth Amendment claim, and she has raised a material issue of fact as to the latter claim, Craft is not entitled to summary judgment on her state battery claim.

Genuine issues of fact also exist as to whether Craft was negligent by failing to use reasonable care when he placed Gosciniak in a control hold.  See Robinson, 278 F.3d at 1016 (denying summary judgment on state law tort claims, including negligence, arising from claims for excessive force).  Accordingly, summary judgment is also denied to Craft on the negligence claim.

2.   Sacramento County

Gosciniak has alleged state law claims against Sacramento County for battery, negligence, and California Civil Code § 52.1.  Under California law, the County may be liable on a respondeat superior theory for the actions of defendant Craft.  Robinson, 278 F.3d at 1016 (noting that California has rejected

22

1  the <u>Monell</u> rule and imposes vicarious liability on counties for
2  acts of its employees).   The County's immunity under California
3  Government Code section 815.2(b) depends on defendant Craft's
4  immunity.   Because the court denies Craft's motion for summary
5  judgment on the ground of immunity from suit on Gosciniak's state
6  claims under section 820.2, the County's motion for summary
7  judgment on the ground of immunity on those claims must also be
8  denied.[14]   However, the County is entitled to summary judgment on
9  Gosciniak's claims under the California Constitution and
10 California Civil Code § 51.7 for the same reasons discussed in
11 connection with these claims against Craft.

12                3.  <u>Arco Arena</u>

13                Gosciniak has also alleged state law claims for
14 battery, negligence, and California Civil Code § 52.1 against
15 Arco Arena.[15]   Under California law, an employer is generally not
16 vicariously liable for the tortious acts of an independent
17 contractor.   <u>Carroll v. Federal Exp. Corp.</u>, 113 F.3d 163, 165
18 (9th Cir. 1997) (citing <u>Privette v. Superior Court</u>, 5 Cal. 4th
19 689, 695 (1993)).  "When the facts regarding whether a person is
20 an employee or an independent contractor permit only one

22     [14]   Gosciniak has not raised a triable issue that the
23 County separately breached a duty toward her that was the cause
   of the alleged violation.  Accordingly, the only viable
24 negligence claim against the County is one based on its vicarious
   liability for Craft's alleged negligence.

25     [15]   Arco argues that it is statutorily precluded from
26 liability for Gosciniak's state claims under California Penal
   Code section 70(d).  (Arco Reply at 7); <u>see</u> <u>Melendez v. City of</u>
27 <u>Los Angeles</u>, 63 Cal. App. 4th 1, 8-9 (1998).  While this
   provision may be relevant to Arco's separate cross-claims against
28 the County for indemnity, it does not operate to preclude a claim
   against Arco in the first instance.

1 inference to be drawn, the determination is a question of law."[16]
2 Robinson v. City of San Bernadino Police Dep't, 992 F. Supp.
3 1198, 1206 (C.D. Cal. 1998).

4          Facts in the record raise a triable issue as to whether
5 Craft was an independent contractor or an employee of Arco Arena.
6 Craft testified that while he was working for Arco during the
7 incident at issue, he was in possession of an Arco radio in
8 addition to a police radio.  (Craft Dep. at 80-81).  Peirson
9 testified in his deposition that Craft and other sheriff's
10 supervisors came under his direction, although the degree of
11 control Peirson exerted over their work is unclear.  (Peirson
12 Dep. at 26).  It is also not clear from the record how much
13 freedom Craft had to leave Arco property during a shift and
14 attend to other police matters.  Accordingly, the court cannot
15 find as a matter of law that Craft was an independent contractor,
16 and therefore denies Arco's motion for summary judgment on the
17 state tort claims and claim under section 52.1.[17]

18          However, Arco is entitled to summary judgment on
19 Gosciniak's claims under the California Constitution and

20

21          [16]    Various factors are examined to determine if an
22 independent contractor relationship exists, including the
   employer's right to control the means by which the work is
23 accomplished.  Robinson, 992 F. Supp. at 1206.  (citing In re
   Brown, 743 F.2d 664, 667 (9th Cir.1984)).  At least one district
24 court in the Ninth Circuit has applied this doctrine in a case
   involving state tort claims against a private entity based on the
25 acts of an off-duty police officer.  See Otani v. City and County
   of Hawaii, 126 F. Supp. 2d 1299, 1307-308 (D. Haw. 1998).

26          [17]    Gosciniak has not raised a triable issue that Arco
27 breached a duty toward her that was the cause of the alleged
   violation.  Accordingly, the only viable negligence claim against
28 Arco is one based on its vicarious liability for Craft's alleged
   negligence.

1 | California Civil Code § 51.7 for the same reasons discussed in
2 | connection with these claims against Craft.

3 |     IT IS THEREFORE ORDERED that:

4 |     (1)  Defendant Robert Craft's motion for summary judgment
5 |          with respect to plaintiff's section 1983 claim against
6 |          him for excessive force in violation of the Fourth
7 |          Amendment be, and same hereby is, DENIED.

8 |     (2)  Craft's motion for summary judgment with respect to
9 |          plaintiff's state law claims against him for battery,
10 |          negligence, and California Civil Code Section 52.1 be,
11 |          and same hereby is, DENIED.

12 |     (3)  Sacramento County's motion for summary judgment with
13 |          respect to plaintiff's section 1983 claim be, and the
14 |          same hereby is, GRANTED.

15 |     (4)  Sacramento County's motion for summary judgment with
16 |          respect to plaintiff's state law claims against it for
17 |          battery, negligence, and California Civil Code Section
18 |          52.1 be, and same hereby is, DENIED.

19 |     (5)  Kings Arco Arena Limited Partnership L.P.'s motion for
20 |          summary judgment with respect to plaintiff's section
21 |          1983 claim be, and the same hereby is, GRANTED.

22 |     (6)  Kings Arco Arena Limited Partnership L.P.'s motion for
23 |          summary judgment with respect to plaintiff's state law
24 |          claims against it for battery, negligence, and
25 |          California Civil Code Section 52.1 be, and same hereby
26 |          is, DENIED.

27 | ///

28 | ///

25

1    (7)    Summary judgment is HEREBY GRANTED to all defendants on

2           plaintiff's remaining claims under the California

3           Constitution and California Civil Code § 51.7.

4    DATED:   June 21, 2002

5

6                              WILLIAM B. SHUBB
                               UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                   26

United States District Court
for the
Eastern District of California
June 24, 2002

\* \* CERTIFICATE OF SERVICE \* \*

2:01-cv-00174

Gosciniak

v.

County of Sacramento

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  June 24, 2002, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

Michael Joseph Haddad                    SH/WBS
Haddad and Sherwin
1300 Clay Street
Suite 600
Oakland, CA  94612

Michelle J Drees
Barry and Randolph
1000 G Street
Suite 100
Sacramento, CA  95814

Jennifer Michele Kearns
Callahan McCune and Willis LLP
580 California Street
Suite 542
San Francisco, CA  94104

David Lee Price
Law Office of David L Price
1485 Response Road
Suite 108
Sacramento, CA  95815

Jack L. Wagner, Clerk

_A. Mena-Sánchez_
by: Deputy Clerk